## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUDOLPH TATAR, | ) | Civil Action No. |
| | ) | |
| *Plaintiff*, | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| WASHINGTON APA NMB, LLC d/b/a | ) | |
| JOHN SISSON MOTORS, INC. n/k/a | ) | |
| MERCEDES-BENZ OF WASHINGTON, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Rudolph Tatar, by and through the undersigned counsel, files the following Complaint in Civil Action against Defendant, Washington APA NMB, LLC d/b/a John Sisson Motors, Inc. n/k/a Mercedes-Benz of Washington, averring as follows:

## THE PARTIES

1.      Plaintiff, Rudolph Tatar ("Plaintiff"), is a 31-year-old male who identifies as homosexual and resides in 1400 Main Street, Apartment 457, Canonsburg, Pennsylvania 15317.

2.      Defendant, Washington APA NMB, LLC d/b/a John Sisson Motors, Inc. n/k/a Mercedes-Benz of Washington ("Defendant"), is a limited liability company formed under the laws of Florida and is registered with the Department of State to do business in the Commonwealth of Pennsylvania utilizing a commercial registered agent of Harbor Business Compliance Corporation, located at 5875 NW 163rd Street, Suite 104, Miami Lakes, Florida 33014. Additionally, Defendant has business operations located at 470 Washington Road, Washington, Pennsylvania 15301, which is the physical location Plaintiff reported to for his workplace duties (the "Facility").

## JURISDICTION AND VENUE

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (hereinafter, "Federal Question Jurisdiction"), as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* (hereinafter, "Title VII") (Plaintiff's claims arising under Title VII identified as the "Federal Law Claims").

4.      Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. ("PHRA") (Plaintiff's claims arising under the PHRA are identified as the "State Law Claims").

5.      This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.

6.      Further, the operative facts between the Federal Law Claims and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United States Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

7.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (the "Western District") as a substantial part of the events and

omissions giving rise to the Federal Law Claims and State Law Claims occurred within this judicial

district.  Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Specifically, these events and omissions occurred in Washington County, Pennsylvania which is one of the counties encompassed by the Western District.

9.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Washington County, Pennsylvania, and conduct arising within Washington County is docketed within the Pittsburgh Division of the Western District pursuant to Local Civil Rule 3 (LCvR 3).

**C.      This Court May Exercise Personal Jurisdiction Over Defendant.**

10.     This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court may exercise jurisdiction over Defendant in compliance with the Due Process Clause of the United States Constitution.

11.     Personal jurisdiction is proper over a Defendant if the Defendant is a registered Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301.  *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470, 2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

12.     42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person."  42 Pa. C.S. § 5301(a).  This exercise of personal jurisdiction is expanded to "corporations" within 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations. --
> (i) Incorporation under or qualification as a foreign corporation
> under the laws of this Commonwealth.

(ii) Consent, to the extent authorized by the consent.
(iii) The carrying on of a continuous and systematic part of its
general business within this Commonwealth.

42  Pa. C.S. § 5301(a)(2).

13.    Defendant is registered as a limited liability company formed under the laws of the

Commonwealth of Pennsylvania.  Additionally, Defendant maintains the Facility in Pennsylvania

and conducts business operations within Pennsylvania.

14.    Accordingly, Defendant may properly be brought before this Court pursuant to 42

Pa. C.S. § 5301(a).

**D.    Plaintiff Has Exhausted His Administrative Remedies; His Federal and State Law
Claims Are Properly Before This Court.**

15.    Plaintiff has satisfied all procedural and administrative prerequisites under 42

U.S.C. § 2000e-5 and 43 P.S. § 959 and now may proceed to bring this action before the Court.

Specifically:

    a.    On October 28, 2024, Plaintiff dual filed a charge of discrimination with the

        Equal Employment Opportunity Commission (the "EEOC") seeking redress for

        the Federal Law Claims and the State Law Claims at charge number 533-2025-

        00280 (the "EEOC Charge") and with the Pennsylvania Human Relations

        Commission (the "PHRC").

    b.    On May 6, 2025, the EEOC issued the Notice of Right to Sue ("RTS Notice")

        wherein Plaintiff was afforded 90 days within which to timely file the Federal

        Law Claims and the State Law Claims.  A true and correct copy of the RTS

        Notice is attached hereto as **"Exhibit A"** and incorporated herein.  The instant

        Complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

16.     After a brief hiatus from employment with Defendant, Plaintiff re-commenced his employment with Defendant on April 15, 2021, in the role of "Sales Consultant" (the "Position").

17.     Plaintiff worked in a "full-time" capacity and often worked in excess of 40 hours per week.

18.     Plaintiff earned approximately $125,000 per year through his salary and commission.

19.     At all times relevant herein, Plaintiff identifies as homosexual, and Defendant was aware of Plaintiff's sexual orientation.

20.     Specifically, Defendant's General Manager, Angela Marcinizyn ("Ms. Marcinizyn"), who was Plaintiff's direct supervisor, was made aware of Plaintiff's sexual orientation through his formal notification to her prior to his initial commencement of employment.

21.     Throughout Plaintiff's tenure at Defendant, his then significant other, Nicholas Fix ("Mr. Fix"), was a frequent customer of Defendant and was known to Ms. Marcinizyn.

22.     On August 31, 2023, Mr. Fix brought his car to the Facility to be serviced after a minor accident.

23.     As Mr. Fix had no mode of transportation while his car was being repaired, he requested that Defendant provide him with a courtesy vehicle or ride.

24.     Plaintiff took Mr. Fix's request to Ms. Marcinizyn and stated that Mr. Fix was at the Facility and needed to be driven somewhere or provided with a courtesy vehicle while his personal vehicle was serviced by Defendant.

25.     Given the fact that customers of Defendant are often provided with courtesy vehicles and other similar accommodation, it was not unreasonable for Mr. Fix to request a courtesy vehicle or ride.

26.     However, Ms. Marcinizyn vehemently refused to provide a courtesy vehicle or permit Plaintiff to briefly depart the Facility in order to provide transportation to Mr. Fix.

27.     Plaintiff was confused by this staunch refusal and questioned Ms. Marcinizyn's reasoning behind the decision.

28.     This questioning of her decisions incensed Ms. Marcinizyn.

29.      She then reprimanded Plaintiff in a very public, loud, and chastising manner, in the presence of others at the Facility.

30.     Plaintiff was left visibly shaken and physically trembling due to the degrading and demeaning nature of treatment he endured from Ms. Marcinizyn.

31.     Moreover, Plaintiff was shocked at Ms. Marcinizyn's refusal as Plaintiff's similarly situated coworkers had historically been permitted to provide transportation, and other related elevated services, to Defendant's clientele.

32.     At this point, it was clear to Plaintiff that Ms. Marcinizyn possessed a clear discriminatory bias against homosexual people, as she had no other basis to staunchly deny Plaintiff from providing these services to Mr. Fix.

33.     When Mr. Fix asked Plaintiff why Ms. Marcinizyn would not permit him to provide a Mercedes-Benz customer with a courtesy ride that would take approximately ten minutes, Plaintiff could only relay—while still shaking from embarrassment—that Ms. Marcinizyn was opposed to the idea.

34.    Ms. Marcinizyn's homophobic animus was obvious to Mr. Fix as well.  After the above-delineated incident, Mr. Fix posted an online review of Defendant in which he stated that he thought Ms. Marcinizyn was homophobic and did not like her presence, writing "*she's homophobic…I don't know why  she was so mean.*"

35.    In or about early September 2023, Bob Yuska ("Mr. Yuska") a member of Defendant's human resources department, visited the Facility to investigate Ms. Marcinizyn's discriminatory behaviors including those directed at Plaintiff and Mr. Fix.

36.    Mr. Yuska told Plaintiff that the situation and especially Mr. Fix's online review "didn't look good" for Plaintiff.

37.    In doing so, Mr. Yuska confirmed that Defendant had knowledge of a complaint against Ms. Marcinizyn via said review.

38.    In the meeting with Mr. Yuska, Plaintiff elaborated on how Ms. Marcinizyn's homophobic actions were prevalent and unwelcome in the work environment.

39.    Despite the reports of discrimination in the workplace, Mr. Yuska refused to elevate Plaintiff's complaint and refused to take any remedial measures concerning Ms. Marcinizyn's conduct.

40.    As such, Defendant never commenced an investigation into Ms. Marcinizyn's conduct.

41.    After this report to Mr. Yuska, Ms. Marcinizyn and Defendant launched a retaliatory campaign targeted at Plaintiff, which was designed to ostracize him from Defendant's operations.

42.    Thereafter, in or around October 2023, Plaintiff received a write-up for not meeting his monthly sales quota of eight cars (the "First Write-Up").

43.     Beginning in or around November 2023, Defendant instituted a "redemption board" wherein sales consultants who did not sell eight units per month were publicly shamed in front of their coworkers at the Facility.

44.     Specifically, their names were written on a large whiteboard which delineated their total number of sales which Defendant's management team, Ms. Marcinizyn included, used to openly reprimand and shame employees for their "substandard" performance.

45.     In addition to the public shaming, individuals assigned to the so-called "redemption board" were denied sales leads from online inquiries (the "Redemption Board Policy").

46.     Both socially and economically, online sales leads were considered more lucrative leads in that the individuals submitting the inquiry had a higher probability of purchasing the inquired-for vehicle.

47.     In November of 2023, due to the First Write-Up, Plaintiff was one of several employees subject to the Redemption Board Policy and was both denied online leads and publicly shamed.

48.     Meanwhile, other sales consultants on the redemption board, such as Caitlin (last name unknown) ("Caitlin") and Ryan (last name unknown) ("Ryan"), were still receiving leads at this time, but Plaintiff was not.

49.     Correspondingly, as Plaintiff's wages were commission-based, the denial of these online inquiries economically damaged him as it erroneously denied him opportunities to earn commission wages.

50.     In or about December of 2023 Plaintiff was interested in obtaining a new personal vehicle and notified Ms. Marcinizyn; Defendant's Sales Manager, Drew Todd ("Mr. Todd"); and Defendant's Sales Manager, Clifford Burns ("Mr. Burns") of his interest in obtaining a new vehicle.

51.     Ms. Marcinizyn and Mr. Todd told Plaintiff that they would "look into it later" but failed to provide a material response.

52.     Subsequently, Plaintiff asked Ms. Marcinizyn in-person about the lease, to which she responded by claiming she had thought the lease was for a client of Defendant's rather than Plaintiff and as such did not follow up with him.

53.     Ms. Marcinizyn further stated she was busy and would instruct Mr. Todd to work on the lease, completely dismissing Plaintiff's inquiry.

54.     When Mr. Todd finally got back to Plaintiff, he provided an estimated cost of $1,100.00 per month, which in Plaintiff's experience, was an unusually high rate for the car he selected.

55.     Plaintiff sensed there was something afoul with this estimate and contacted "Sales Consultant" (last name unknown) ("Ellen"), who confirmed that the average lease price for the vehicle he had selected was approximately $800.00 per month.

56.     Upon hearing this, Plaintiff was perturbed and again confused by this exorbitantly high rate and began to research other facilities to obtain the vehicle from.

57.     Eventually, Plaintiff elected to lease the vehicle from another one of Defendant's dealership located in Hershey, Pennsylvania (the "Hershey Facility").

58.     Shortly thereafter, Plaintiff began the process of purchasing the vehicle from the Hershey Facility with "Sales Consultant," Dan (last name unknown) ("Dan").

59.     Dan performed the loan process and notified Plaintiff that because he was a Star-Certified Sales Consultant, it would only cost him $770 per month to lease the vehicle.

60.     Plaintiff was excited to see he received a substantially lower rate at the Hershey Facility than what was offered to him at the Facility and expressed his confusion with the disparity to Dan, who stated he was unsure how Mr. Todd reached the number he did.

61.     Plaintiff then traveled to Hershey, Pennsylvania to pick up the vehicle on his next day off.

62.     Upon driving it to the Facility for his next scheduled shift, Plaintiff received backlash from Ms. Marcinizyn for not leasing the vehicle via the Facility, who snidely commented "*I see you got a new car.*"

63.     Plaintiff replied to Ms. Marcinizyn that he had only leased the car from another location because Ms. Marcinizyn and Mr. Todd tried to overcharge him.

64.     Ms. Marcinizyn attempted to feign ignorance regarding the intentionally inflated rate, but Plaintiff then questioned her and asked why the Hershey Facility quoted him a rate nearly $400.00 less than what she and Mr. Todd quoted him.

65.     Unsurprisingly, Ms. Marcinizyn did not substantively respond.

66.     Following the above, Plaintiff once again complained to Mr. Yuska in regard to Ms. Marcinizyn's discriminatory treatment and requested an in-person meeting to discuss her conduct.

67.     Mr. Yuska visited the Facility, and after speaking with Plaintiff alone, he proposed bringing in Ms. Marcinizyn to discuss the ongoing issues.

68.     In the course of the meeting, Ms. Marcinizyn did not take any responsibility for her conduct, nor did Defendant, via Mr. Yuska, redress the discrimination directed at Plaintiff.

69.     On or about December 30, 2023, the last sales day of the month, Ms. Marcinizyn advised all sales consultants at the Facility that whoever sold a display car (the "Display Car") would be credited with selling two units.

70.     Plaintiff sold seven units up to that point in the month and was motivated to sell the Display Car to meet his monthly sales quota.

71.     Shortly thereafter, Plaintiff received a notification via text message that a lead, Tim Pennybacker ("Mr. Pennybacker"), was interested in the Display Car.

72.     Plaintiff immediately sent a text message to Mr. Pennybacker to discuss the car and simultaneously notified Ms. Marcinizyn, Mr. Todd, and Mr. Burns that he possessed a sales lead that was interested in purchasing the Display Car.

73.     Ms. Marcinizyn acknowledged Plaintiff and appeared pleased by the news, while Mr. Todd and Mr. Burns ignored him.

74.     Upon returning to his desk moments later, Plaintiff noticed that he was no longer assigned as the sales consultant for Mr. Pennybacker; rather, another sales consultant, Creed Potkul ("Mr. Potkul"), was now assigned to the lead (the "Lead Transfer").

75.     Plaintiff was confused by this, and then spoke to Defendant's Internet Manager, Kylie Steever ("Ms. Steever"), about the Lead Transfer.

76.     Ms. Steever showed Plaintiff how to run an "audit trail" to view a detailed record of a lead.

77.     Upon running the audit trail for Mr. Pennybacker, Plaintiff discovered that only 94 seconds had passed between the time the sales lead was assigned to Plaintiff and the time Mr. Todd reassigned it to Mr. Potkul, a heterosexual employee.

78.    The Lead Transfer, as set forth above, contravened Defendant's policy that Sales Consultants were allotted two hours to follow up with leads generated from online sources.

79.    Furthermore, in the course of Plaintiff's tenure, no heterosexual employee was ever given less than two hours to respond to a website inquiry.

80.    Pertinent here, Ms. Marcinizyn (i) was aware the sales lead was assigned to Plaintiff; (ii) was aware that Plaintiff was pursuing the sales lead; (iii) was aware that the sales lead was transferred to a heterosexual employee; (iv) knew the sales of the Display Car was valuable to Plaintiff; and (v) refused to intervene and stop the Lead Transfer in an otherwise obvious effort to sabotage Plaintiff's workplace performance.

81.    In light of the fact that Mr. Potkul remained tasked with the lead, it is clear Ms. Marcinizyn refused to rectify the issue, which, as General Manager, she had full ability to do.

82.    On or about January 4, 2024, having now denied Plaintiff a legitimate opportunity to meet his sales quota, Ms. Marcinizyn assigned Plaintiff a second write-up for not meeting his sales quota (the "Second Write-Up").

83.    Plaintiff protested the disciplinary report given Ms. Marcinizyn had sabotaged his monthly sales via the Lead Transfer and stated had the lead remained assigned to Plaintiff, he would have met and surpassed his monthly quota.

84.    Despite Plaintiff's notification of his concerns, Ms. Marcinizyn failed to substantively engage with Plaintiff and upheld the Second Write Up.

85.    Shortly thereafter, on or about January 30, 2024, with still no word from Defendant in regard to his issues with the Second Write-Up, Plaintiff approached Andy (last name unknown) ("Andy"), who exercised authority over all the general managers in Pennsylvania, including Ms. Marcinizyn, and happened to be present at the Facility that day.

86.    Plaintiff reiterated his complaints related to Ms. Marcinizyn and her discriminatory actions against him.

87.    Andy dismissed Plaintiff by telling him that the complaints were "all hearsay," which indicated to Plaintiff that Defendant had no plans to investigate let alone remediate the discrimination perpetuated by Ms. Marcinizyn.

88.    At that point, it was abundantly clear to Plaintiff that Ms. Marcinizyn was given free rein to subject him to disparate treatment.

89.    It was also clear that Defendant offered Plaintiff a choice: either accept Ms. Marcinizyn's discriminatory work environment that substantially reduced his wages or quit.

90.    Plaintiff accepted that he had been constructively discharged and notified Mr. Burns, the only manager available at the time, that he would no longer be working for Defendant, and January 30, 2024, was his last day of employment with Defendant.

<u>**COUNT I**</u>
**DISCRIMINATION ON THE BASIS OF SEXUAL ORIENTATION
IN VIOLATION OF TITLE VII AND THE PHRA
42 U.S.C. 2000,** *et seq.* **and 43 P.S. § 951,** *et seq.*

90.    Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

91.    "In order to establish a *prima facie* case of gender discrimination, an employee must show that: (1) they are a member of a protected group; (2) they are qualified for the position at issue; (3) they were discharged or suffered some adverse employment action by the employer; and (4) they were treated less favorably than other similarly situated employees outside the protected group." *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (internal citations and alterations omitted).

**A.    Plaintiff is a Member of a Protected Class and Was Qualified for the Position at Issue.**

92.    At all times relevant herein, Plaintiff identifies as homosexual, which accordingly makes him a member of a protected class.

93.    As discussed above, Plaintiff was qualified to perform the job duties as evidenced by the fact that he possessed and exercised the skill, experience, and ability necessary to perform the essential functions of his position.

94.    Specifically, Plaintiff was sufficiently skilled in the areas of client management, vehicle sales, and customer service.

95.    Further, Plaintiff's qualification is evidenced through his multiple tenures at Defendant wherein he received no reprimands or write-ups prior to Ms. Marcinizyn's retaliatory conduct.

**B.    Plaintiff Suffered Adverse Employment Actions and Was Treated Less Favorably Than Similar Employees Outside His Protected Class.**

96.    Plaintiff suffered a discriminatory application of Defendant's policies and procedures compared to his similarly situated heterosexual coworkers due to his sexual orientation.

97.    Plaintiff suffered two discriminatory written formal warnings while his similarly situated non-homosexual coworkers were not written up for the same conduct.

98.    Furthermore, Plaintiff suffered discriminatory harassment and a hostile work environment perpetuated by his supervisor which tacitly approved of by Defendant, which is evidenced by his erroneous write ups and other reprimands.

99.    Plaintiff suffered interference with customer service and sales not suffered by his similarly situated heterosexual coworkers due to his sexual orientation, which caused him both economic and emotional distress.

14

100.    Finally, Plaintiff suffered the ultimate adverse employment action when he was constructively discharged by Defendant.

101.    As such, Defendant contravened provisions of Title VII and the PHRA in treating Plaintiff disparately from his similarly situated heterosexual coworkers.

102.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

103.    WHEREFORE, Plaintiff, Rudolph Tatar, seeks the damages set forth in the *Ad Damnum* and Request for Relief clause of this Complaint, *infra*.

**COUNT II**
**RETALIATION FOR REPORTING DISCRIMINATION**
**IN VIOLATION OF TITLE VII AND THE PHRA**
**42 U.S.C. 2000, et seq. and 43 P.S. § 951, et seq.**

104.    Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

105.    To establish a *prima facie* case of retaliation under Title VII, an employee must show that "(1) he engaged in protected activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action." *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 231-32 (3d Cir. 2007).

**A.    Plaintiff Engaged in Protected Activity by Reporting Discrimination.**

106.    Both formal and informal complaints of discrimination constitute a "protected activity" which trigger the anti-retaliation provisions enshrined within Title VII. *Griffin v.*

*Allegheny Answering Serv.*, 2005 U.S. Dist. LEXIS 53198, *28 citing *Abramson v. William Paterson College*, 260 F.3d 265, 286 (3d Cir. 2001).

107.    Beginning in or around September 2023, Plaintiff complained to Defendant's Human Resources Department, via Mr. Yuska, about discrimination he suffered at the hands of Ms. Marcinizyn.

108.    Furthermore, in December 2023, Plaintiff reported Ms. Marcinizyn's discriminatory conduct relating to the intentionally inflated lease rate she provided to Plaintiff.

109.    Accordingly, Plaintiff's reports of discrimination constituted "protected activity" within the purview of Title VII and the PHRA.

**B.    Plaintiff Subsequently Suffered Adverse Employment Actions.**

110.    Within a short time after complaining about discrimination in September 2023, Plaintiff suffered written warnings, a denial of sales leads, public reprimand and ultimately, a constructive discharge.

111.    Specifically, after Plaintiff's first report to Yuska in September 2023, he was retaliatory administered the First Write Up by Ms. Marcinizyn.

112.    Then, Plaintiff was denied the opportunity to obtain online sales leads, an adverse action taken against him intentionally designed to cause him economic harm.

113.    Then, in December 2023, after reporting Ms. Marcinizyn's discriminatory conduct to Yuska for a second time, he was shortly thereafter administered the Second Write Up.

114.    Given that a close temporal proximity exists between the time of Plaintiff's first complaint of discrimination and the time of his first written warning to his constructive discharge –several weeks – a sustainable inference arises that Defendant retaliated against Plaintiff for the protected activity of reporting discrimination in violation of Title VII and/or the PHRA.

115.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

116.    WHEREFORE, Plaintiff, Rudolph Tatar, seeks the damages set forth in the *Ad Damnum* and Request for Relief clause of this Complaint, *infra*.

**COUNT III**
**CONSTRUCTIVE DISCHARGE**
**IN VIOLATION OF TITLE VII AND THE PHRA**
**42 U.S.C. 2000, *et seq*. and 43 P.S. § 951, *et seq*.**

117.    Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

118.    In order to establish a constructive discharge, plaintiffs must show "the abusive working environment became so intolerable that . . . resignation qualified as a fitting response." *Penn. State Police v. Suders*, 542 U.S. 129, 133–34 (2004). The test is objective and looks to whether "a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 141.

119.    Further, under Pennsylvania law, constructive discharge occurs when working conditions are so intolerable that a reasonable employee is forced to resign. *Kroen v. Bedway Sec. Agency, Inc.*, 633 A.2d 628, 633–34 (Pa. Super. Ct. 1993); *Helpin v. Trustees of Univ. of Pennsylvania*, 969 A.2d 601, 614 (Pa. Super. Ct. 2009), *aff'd*, 10 A.3d 267 (Pa. 2010). A constructive discharge occurs when "the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 331 (3d Cir. 2016) (brackets omitted).

**A.    Plaintiff's Working Conditions Were So Intolerable that any Reasonable Employee Would be Forced to Resign.**

120.    Due to the adverse employment action Plaintiff suffered, including the removal of valuable leads, interference with customer service and sales, discriminatory written warnings that threatened Plaintiff's employment and ability to earn a competitive wage, Plaintiff's work environment became intolerable.

121.    Specifically, the discriminatory and retaliatory conduct from Ms. Marcinizyn became a routine part of Plaintiff's workday, and served to alter his work schedule, work duties, and his ability to freely perform his role.

122.    Additionally, the intentional targeting of Plaintiff caused him to suffer severe emotional distress which impacted his ability to perform duties of the Position in a mind state free of duress.

**B.    Defendant Permitted the Conditions Which Gave Rise to Plaintiff's Constructive Discharge**

123.    As averred above, Defendant, through Ms. Marcinizyn, implemented and perpetuated discriminatory and retaliatory conduct targeting Plaintiff.

124.    Specifically, Defendant administered erroneous and retaliatory write-ups to Plaintiff, that served as nothing but a basis for Defendant and Ms. Marcinizyn to constantly reprimand and berate Plaintiff.

125.    Further, Defendant, through Ms. Marcinizyn, unilaterally denied Plaintiff potential financial earnings by barring him from utilizing online sales leads, due to the aforementioned retaliatory write-ups.

126.    Meanwhile, Plaintiff's similarly situated heterosexual coworkers did not endure the removal of valuable leads, interference with customer service and sales, and discriminatory write-ups and reprimands that threatened their employment and ability to earn competitive wages.

127.    As such, Defendant contravened the commands of Title VII and/or the PHRA in treating Plaintiff disparately from his similarly situated heterosexual coworkers.

128.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

129.    WHEREFORE, Plaintiff, Rudolph Tatar, seeks the damages set forth in the *Ad Damnum* and Request for Relief clause of this Complaint, *infra*.

## JURY DEMAND

130.    Plaintiff demands a trial by jury on all matters so triable.

## *AD DAMNUM* CLAUSE AND PRAYER FOR RELIEF

131.    For the above-stated reasons, Plaintiff, Rudolph Tatar, respectfully requests this Honorable Court to enter judgment in his favor, and against Defendant, Washington APA NMB, LLC d/b/a John Sisson Motors, Inc. n/k/a Mercedes-Benz of Washington, and prays for relief as follows:

(a)    Declare and find that Defendants committed one or more of the following acts:

(i)    Violated Title VII and/or the PHRA in discriminating against Plaintiff on the basis of his sexual orientation;

19

      (ii)     Violated Title VII and/or the PHRA by retaliating against Plaintiff for reporting discrimination; and

      (iii)    Violated Title VII and/or the PHRA by constructively discharging Plaintiff due to his sexual orientation;

(b)     Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

(c)     Award punitive damages for intentional discrimination and retaliation;

(d)     Award reasonable attorneys' fees and costs of suit incurred prosecuting these claims;

(e)     Award pre-judgment and continuing interest as calculated by the Court;

(f)     Award injunctive and other equitable relief as provided by law; and

(g)     Award such other and further relief as this Court deems just, equitable, and proper.

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: August 4, 2025                    By: */s/ Erik M. Yurkovich*
                                        Erik M. Yurkovich (Pa. I.D. No. 83432)
                                        Elizabeth A. Murphy (Pa. I.D. No. 334769)

                                        The Workers' Rights Law Group, LLP
                                        Foster Plaza 10
                                        680 Andersen Drive, Suite 230
                                        Pittsburgh, PA 15220
                                        Telephone: 412.910.8057
                                        Facsimile: 412.910.7510
                                        erik@workersrightslawgroup.com
                                        elizabeth@workersrightslawgroup.com

                                        *Counsel for Plaintiff, Rudolph Tatar*